K1v1camc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
KATHY CAMACHO, et al.,

                    Plaintiffs,

          v.                          19 Civ. 11096 (DLC)

CITY OF NEW YORK, et al.,

                    Defendants.
------------------------------x
ARISBEL GUSMAN,

                    Plaintiff,

          v.                          19 Civ. 11691 (DLC)

CITY OF NEW YORK, et al.,

                    Defendants.        Conference
------------------------------x
                                       New York, N.Y.
                                       January 31, 2020
                                       2:24 p.m.

Before:
          HON. DENISE COTE, District Judge

                         APPEARANCES

EMERY CELLI BRINCKERHOFF & ABADY LLP
      Attorneys for Plaintiffs (11 Civ. 11096)
BY:  DAVID B. BERMAN, ESQ.
      MATTHEW D. BRINCKERHOFF, ESQ.

ROMANO & KUAN, PLLC
      Attorneys for Plaintiffs (11 Civ. 11096)
BY:  JULIA P. KUAN, ESQ.

LAW OFFICES OF GOLDMAN & ASSOCIATES
      Attorneys for Plaintiff (11 Civ. 11691)
BY:  STEVEN H. GOLDMAN, ESQ.
      PETER A. BARTA, ESQ.

NEW YORK CITY LAW DEPARTMENT
OFFICE OF THE CORPORATION COUNSEL
      For Defendants
BY:  MARK D. ZUCKERMAN, Assistant Corporation Counsel

K1v1camc

1          (Cases called)

2          THE DEPUTY CLERK:  Counsel for plaintiff Gusman,

3  please stand and state your name for the record.

4          MR. GOLDMAN:  Yes.  For Ms. Gusman, Steven Goldman.

5  Good afternoon, Judge.

6          THE DEPUTY CLERK:  And who is with you at counsel

7  table?

8          MR. BARTA:  Also for Ms. Gusman Peter Barta.  Good

9  afternoon.

10          THE COURT:  Thank you.

11          THE DEPUTY CLERK:  And counsel for defendants in the

12  Gusman matter, please state your name for the record.

13          MR. ZUCKERMAN:  Good afternoon, your Honor.  Mark

14  Zuckerman for the defendants who have appeared in the case, in

15  the Gusman case.

16          THE DEPUTY CLERK:  Thank you.

17          And counsel for the plaintiff Kathy Camacho and

18  others, please stand and state your name for the record.

19          MR. BERMAN:  David Berman from Emery Celli

20  Brinckerhoff & Abady.

21          MR. BRINCKERHOFF:  And Matthew Brinckerhoff, also from

22  Emery Celli Brinckerhoff & Abady for plaintiff.

23          MS. KUAN:  Julia Kuan from the law firm of Romano &

24  Kuan for plaintiffs.

25          THE COURT:  And Mr. Zuckerman, I know you are

K1v1camc

1    appearing as defense counsel in both cases.

2         So welcome, everyone.  Thank you.  Thank you for your

3    letters.  This is one of two cases before me, but the first

4    case that raises similar issues was filed some time ago.  It's

5    19 Civ. 5554, and summary judgment motions as well as pretrial

6    orders are due April 24th, so it's on a completely different

7    schedule.

8         MR. ZUCKERMAN:  Your Honor, if I may, I believe they

9    had a settlement conference on Wednesday and they reached a

10   settlement in principle.

11        THE COURT:  Well, good.  That is news to me, but that

12   means I only have two active cases before me and it's all right

13   here, so that simplifies my life.

14        And I appreciate that the second case of these two

15   filed cases isn't as far along, but I just thought it would be

16   efficient for us all to meet together and try to set a schedule

17   that makes sense, because of the overlap of the issues.

18        And I know there is some dispute as to whether or not

19   we should be bifurcating class and *Monell* discovery.  One of

20   these actions -- what I'll refer to as the 96 action, using the

21   last two digits in the Civ. number -- is a class action, and

22   the other one is not.  So how I'd like to address this is to

23   give plaintiff's counsel and then defense counsel an

24   opportunity to describe anything to me about the facts in the

25   individual actions that they want me to know as sort of

1    background information, and then I want to talk about a

2    schedule.  And there are a couple of ways to approach the

3    schedule issue.  One is to see if there's some core discovery

4    that should be immediately exchanged or produced and see if

5    that is useful in an early settlement discussion.  It may not

6    be, and so that's one thing I want to hear from counsel,

7    whether we should sort of focus some of our efforts on an

8    exchange of core discovery and early settlement or not.

9            Another issue is: what would be the difference between

10   conducting discovery with respect to the individual plaintiffs

11   in the actions and conducting the discovery as if this were a

12   class action or the *Monell* claim proceeding at the same time as

13   the individual claims.  It's not clear to me what additional

14   discovery is going to be applicable only to the class action or

15   only to the *Monell* claims and not otherwise relevant to pursue

16   with the individual claims.  So that's another thing I want to

17   hear from counsel about.

18           So let's start, just giving everyone an opportunity to

19   give me background information factually about their case, if

20   there's anything you want to fill me in on that may be

21   relevant, so then we're setting the schedule going forward.

22           Mr. Berman, do you want to start.

23           MR. BERMAN:  Sure.  Thank you, your Honor.

24           So our case is on behalf of five individuals who all

25   were arrested at Rikers Island under factually

 1    indistinguishable circumstances.  They all brought books to

 2    Rikers Island, some of them -- one was a book of crossword

 3    puzzles, some that were novels, one was the Quran -- and then

 4    they went through security and books were taken, they were put

 5    in a separate room, held for an extensive amount of time,

 6    usually around 24 hours, all in all, and were arrested and

 7    charged with promoting prison contraband.  They were accused of

 8    having synthetic marijuana, which is referred to as K2, on the

 9    pages of their books; and then all charges were dismissed at

10    the first court appearance when lab tests came back reflecting

11    there was no K2 on any of the books.  Nonetheless, all five of

12    them were still banned from all city correctional facilities

13    going forward for a period of six months to a year.  This meant

14    they couldn't see, in one case a child, and in another case a

15    significant other, other cases close friends, and all the

16    inmates whom they were visiting were also banned from having

17    contact visits, even though this really all amounted to much

18    ado about nothing.

19         And I think the point we just want to emphasize is how

20    similar all these facts, the facts were and the fact that the

21    Gusman case and the other case -- I think it's Williams that

22    settled yesterday -- and sort of just teeing up some of the

23    issues that you had mentioned before, that this really goes to

24    the core of -- is this some, you know, coincidence that these

25    were all settled, that these all occurred in these identical

1  circumstances, or is this a policy or practice of the city that

2  is authorizing these arrests on what seems to us as less than

3  probable cause, and we believe it's happened to others, and we

4  filed suit to attack that policy or practice, whatever it may

5  be.

6       I think those are some of the straightforward facts,

7  and I'll --

8       THE COURT:  Let me just ask one question --

9       MR. BERMAN:  Sure.

10      THE COURT:  -- Mr. Berman.  Are there any special

11 damages for any of your plaintiffs -- that is, any physical or

12 mental injury other than would be readily evident from what you

13 just described?

14      MR. BERMAN:  No, except that one plaintiff -- I

15 believe only one, but perhaps two -- had some economic damages

16 in that they were out of work for a number of weeks because

17 they were suspended as a direct result of the arrest until the

18 process was cleared; but as far as additional physical or

19 emotional damages, no.

20      THE COURT:  Thank you.

21      And Mr. Goldman.

22      MR. GOLDMAN:  Yes, Judge.

23      So Ms. Gusman went to visit her parents on January 3rd

24 last year at Rikers Island.  They happened to be incarcerated

25 there at the time.  She brought with her I think five or six

1  magazines that she bought off an outdoor rack.  I think it had

2  rained somewhat recently so they were a bit -- or they had

3  gotten a little wet and then they'd dried.  She went there with

4  her little brother, who I think was 9 or 10 at the time.  And

5  at some point when she was going to visit one of her parents,

6  with the magazines in tow, she gave the magazines to them, they

7  pulled her out of line, asked her if she had anything to

8  declare about the magazines; she said, of course, no.  They

9  claimed to test -- they put her in a cell, claimed to test the

10  magazines, and claimed, based on a preliminary lab test, that

11  the magazines had K2, synthetic marijuana.  She was then

12  brought over to central booking, of course, and had actually

13  $15,000 bail set on her, which, fortunately, she was able to

14  pay.  She was in jail -- or her family was able to pay.  She

15  was in jail for over 30 hours.  And unlike apparently some of

16  the other plaintiffs in this matter with co-counsel, the case

17  here resulted in three -- two additional court dates.  When --

18  this is a little color to the case.  When bail was set, she

19  literally howled in anguish, thinking that she was going to be

20  going to jail.

21          It turned out that there was no K2.  They did an

22  actual lab test, and that actual lab test showed that there was

23  no K2 on the magazines.  And so on the second adjourned date,

24  after the arraignment, the case was finally dismissed.

25          There are no special damages that I'm aware of.

1    And if there's anything else you'd like me to address,

2 I'm happy to do so.

3    THE COURT:  No.  That's very helpful background.

4 Thank you.

5    Mr. Zuckerman.

6    MR. ZUCKERMAN:  Thank you, your Honor.

7    It is defendants' position that, you know, probable

8 cause is an individualized determination and that the issue or

9 question of probable cause is individualized to each of the

10 plaintiffs in this case.  Essentially each plaintiff was

11 visiting someone or claimed they were visiting someone and came

12 to Rikers Island and went through the security line.  The

13 correction officers who were manning the security line observed

14 a certain texture or liquid on certain books that the

15 plaintiffs were trying to bring into Rikers.  At that point,

16 based upon those observations, a field test was conducted on

17 each of the liquids that was on the books that the plaintiffs

18 were bringing into Rikers Island.  The field test came up

19 positive for K2.

20    We strongly disagree with plaintiffs' assertion that

21 when the NYPD lab results came back, that those lab results

22 showed that there was no K2 on the books that were brought into

23 Rikers Island, or attempted to be brought into Rikers Island by

24 the plaintiffs.  The NYPD lab has a limited number of

25 comparators, and what that test shows is that the substances

1    brought into Rikers Island by the plaintiffs didn't match up

2    with the comparators in the NYPD's lab library, but that

3    doesn't mean there wasn't K2 that the plaintiffs were

4    attempting to bring into Rikers Island.

5            We contend that each of these claims turns on

6    individualized questions of probable cause.

7            THE COURT:  So explain to me, I guess, the limitations

8    on the testing for K2 that can result in the city not being

9    able to move forward with a prosecution.

10           MR. ZUCKERMAN:  All I can really say at this point is

11   that the K2, or alleged K2, that is being brought into Rikers,

12   the NYPD lab has a certain number of -- has comparators, and if

13   the substance that the plaintiffs are trying to bring into

14   Rikers matches up with those comparators in the NYPD lab, then

15   it will come out positive, but if it doesn't match, then it

16   comes back negative, but I guess my point is that there could

17   be additional comparators that would be positive for K2 that

18   the NYPD lab doesn't test for.

19           THE COURT:  So are the pages or books at issue

20   preserved?

21           MR. ZUCKERMAN:  I have put preservation notices in to

22   the NYPD to preserve the physical evidence, yes.

23           THE COURT:  So are you in a position then to say that

24   you will be able to widen the library of comparators and

25   perhaps discover K2 on these pages or not?

K1v1camc

1          MR. ZUCKERMAN:  You mean going forward?

2          THE COURT:  Yes.

3          MR. ZUCKERMAN:  I can't say what will happen going

4    forward, but I can say that everyone is looking at this lawsuit

5    seriously and looking at what to do going forward, but

6    certainly no decisions going forward about the question that

7    your Honor just asked.

8          THE COURT:  So if I understand it then correctly,

9    there is a field test that the city uses at Rikers Island to

10   test for K2.

11         MR. ZUCKERMAN:  That's correct, and that field test,

12   it's my understanding, is used in a bunch of other

13   jurisdictions around the country.

14         THE COURT:  And have there been any cases in which

15   books have been seized and sent to the NYPD lab and there has

16   been a positive hit because there is a comparator present in

17   the lab?

18         MR. ZUCKERMAN:  I believe that there have been

19   convictions, so I would assume that the answer is yes, though

20   I'm not a hundred percent sure of that.  There have been, my

21   understanding, you know, convictions or pleas, but -- so I

22   would assume that's based upon positive matches with the NYPD

23   lab, but I'm not a hundred percent sure of that yet.

24         THE COURT:  Okay.  And you're going to be the attorney

25   managing the defense in these cases?

11

K1v1camc

1          MR. ZUCKERMAN:  That's correct, your Honor.

2          THE COURT:  And so how was this test used, the field

3    test?  How was the field test identified?  Why did the city

4    choose this field test?

5          MR. ZUCKERMAN:  I believe that it's used in other

6    jurisdictions and it's an accepted, state-of-the-art, you know,

7    test.  Obviously we're going to be investigating that test and

8    will look at it further as well.

9          THE COURT:  Okay.  And as part of that investigation,

10   you're also going to be figuring out perhaps the success rate

11   when materials are seized pursuant to the use of that field

12   test and then how frequently there are positives or negatives

13   when the NYPD lab tests those materials?

14         MR. ZUCKERMAN:  Certainly in response to this lawsuit,

15   that's going to be an issue we're going to be looking at.

16         THE COURT:  Okay.  And have you talked with the

17   personnel who chose the field test for the city?

18         MR. ZUCKERMAN:  Not yet, your Honor.  Not yet.

19         THE COURT:  And have you talked to the lab personnel

20   who are familiar with the NYPD lab procedures for testing the

21   seized materials, books and magazines?

22         MR. ZUCKERMAN:  Not yet.  We're still identifying the

23   NYPD lab personnel who would have been involved in these tests,

24   but that's as far as it's gone so far.

25         THE COURT:  Now when you say there are a limited

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1v1camc

1    number of comparators, under what law is material seized or a

2    person held for suspected possession or transmission of K2?

3            MR. ZUCKERMAN:  Well, it could be one of two

4    charges -- either narcotics, possession of narcotics, smuggling

5    of narcotics; or it could be bringing contraband into Rikers.

6    So probable cause would fall at least under those two charges

7    and maybe some other ones too.

8            THE COURT:  And contraband, though, does that bring us

9    right back to narcotics and the definition contained in the

10   criminal law of what narcotics are, or is contraband more

11   broadly defined?

12           MR. ZUCKERMAN:  Contraband could be more broadly

13   defined.

14           THE COURT:  But in this case.

15           MR. ZUCKERMAN:  It could be more broadly defined.  I

16   haven't -- we haven't yet reached the point of, you know -- the

17   lab analysis of these six instances, but it could be more

18   broadly defined.

19           THE COURT:  Could you look into that issue as well.

20           MR. ZUCKERMAN:  Sure.

21           THE COURT:  So assuming now, just for discussion's

22   sake, that the seizure of material and the arrest of

23   individuals for possession or transmission of contraband is no

24   broader, in this case, on these set of facts, than whether or

25   not the materials contained narcotics, so we circle back to the

K1v1camc

1    first of the two reasons you gave, then what particular

2    narcotic or definition of narcotic are you relying on?

3              MR. ZUCKERMAN:  I believe K2 is a synthetic marijuana.

4              THE COURT:  And --

5              MR. ZUCKERMAN:  Synthetic cannabinoid.

6              THE COURT:  Okay.  Would you mind writing me a letter

7    describing the specific substance or substances that permit

8    seizure --

9              MR. ZUCKERMAN:  Sure.

10             THE COURT:  -- so I can just make sure I'm focused on

11   the right subsection of the law.

12             MR. ZUCKERMAN:  Sure.  Sure.

13             THE COURT:  So there's a chemistry that's involved or

14   a molecule that's involved under that legal definition, I take

15   it.  I'm trying to understand why the exemplars or samples in

16   the library, why there has to be a greater number.

17             MR. ZUCKERMAN:  All I'm saying is the field test may

18   be broader than the test at the NYPD lab is doing, and that

19   just because the NYPD lab results come back negative, doesn't

20   mean that that result means that the substance that they were

21   testing for is not K2, because there could be additional

22   comparators that would be K2 that are not part of the NYPD lab

23   testing.

24             THE COURT:  Okay.  So it's a little challenging for me

25   to understand why the NYPD lab would not have an effective test

K1v1camc

1    to identify any compound that is illicit under the law.

2          MR. ZUCKERMAN:  I believe that the NYPD lab may only

3    be testing for controlled substances under New York law, that

4    K2 may be broader than that, but they only test for controlled

5    substances under New York law.

6          THE COURT:  All right.  Okay.  So if that is true and

7    it's not a violation to have in your possession something that

8    is not illicit under New York law, then the field test is

9    capturing both legal and illegal activity.

10          MR. ZUCKERMAN:  Well, it still could be contraband.

11          THE COURT:  Oh, okay.  So that takes us into that

12    second prong.

13          MR. ZUCKERMAN:  Right.

14          THE COURT:  And what --

15          MR. ZUCKERMAN:  Just, if I can add one thing.  The

16    NYPD lab may also test for K2, which is banned under federal

17    law.  I'm not sure of that, but that's possible.

18          THE COURT:  So you believe there's a difference in the

19    list of controlled substances under federal and state law?

20          MR. ZUCKERMAN:  There may be as to K2.  It's something

21    I'll have to look into.

22          THE COURT:  Okay.  So if you could in your letter --

23          MR. ZUCKERMAN:  Yeah.

24          THE COURT:  -- address each of these issues.  And if

25    you order a copy of the transcript.

K1v1camc

        MR. ZUCKERMAN:  Sure.

        THE COURT:  Good.  So --

        MR. ZUCKERMAN:  I will.  I haven't done that yet,
but --

        THE COURT:  Yes.  Thank you.  Thank you.

        So to the extent that probable cause is provided, in
the city's view, by the regulation of the transmission of
contraband, that that is broader than a violation of state law
for possession or distribution of narcotics -- and you'll
identify that so we can understand that.

        MR. ZUCKERMAN:  Sure.

        THE COURT:  To the extent that the NYPD law is unable
to --

        MR. ZUCKERMAN:  Lab.

        THE COURT:  -- lab -- thank you -- is unable to
identify those substances which are possessed in violation of
state law, I'd like to know that.  To the extent that the field
test is overinclusive so it includes not only the
identification of substances that are possessed in violation of
New York State law but also other substances which are not
illegal under New York State law to possess, I'd like to know
that.

        MR. ZUCKERMAN:  I would just add that they would still
be illegal, because there's still contraband being brought into
Rikers Island, even if they're not a controlled substance under

K1v1camc

1  New York law.

2          THE COURT:  Well, perhaps, but that's the first issue

3  you're going to explain and address --

4          MR. ZUCKERMAN:  Sure.

5          THE COURT:  -- what is this broader category that

6  expands beyond possession of a substance banned under New York

7  State narcotics law.  Obviously we're not talking about

8  contraband as far as weapons or cigarettes or -- I understand

9  that the contraband law would be broader than the narcotics

10  law, but we're talking about substances that could be contained

11  on the pages of books or --

12          MR. ZUCKERMAN:  Or maybe rolled up and smoked by an

13  inmate.

14          THE COURT:  That's right.  That's right.

15          Good.  Good.  That will be very helpful to me.  Thank

16  you.

17          So let's just talk generally then about whether it

18  makes sense for the individual plaintiffs and the defendants in

19  this case to try to identify core discovery and have a fairly

20  quick settlement discussion to see if that succeeds in

21  resolving the case for the parties or whether that's just a

22  nonstarter and you should avoid trying to identify such core

23  discovery, setting then a schedule for early settlement

24  discussions.

25          Do you have a view on that, Mr. Berman?  Just as a

K1v1camc

1    theoretical matter.

2            MR. BERMAN:  Yes.  I think our view is that the core

3    discovery would be the *Monell* discovery that they are saying

4    they want to bifurcate and that, you know, we can do discovery

5    on the individual circumstances of the five plaintiffs, but I

6    think that there's the overarching issue of the case, a lot of

7    questions you just asked, you know, about what is the process

8    here about the field tests, about what the policy is.  So if we

9    can do *Monell* discovery, I think that would very quickly assess

10   the strength of the case and whether we're talking about five

11   individuals or something much bigger, but --

12           THE COURT:  So I don't think it's helpful to me to

13   talk about *Monell* discovery.  I think the issues I've been

14   inquiring about would be issues in this case if there were just

15   individual claims --

16           MR. BERMAN:  Okay.

17           THE COURT:  -- for an individual plaintiff.  Now there

18   may be additional issues that are implicated by *Monell*

19   discovery, but any individual plaintiff has a right to

20   understand I think the reliability of the field test and how

21   the field test interacts with the New York lab analysis in

22   their hits.  And so if I just had one plaintiff and no claim

23   against the city and no class action, I think that single

24   plaintiff would have a right to explore these issues.  Do you

25   think that's right?

K1v1camc

1    MR. BERMAN:  I think they would.  I don't know that

2  defense counsel would necessarily agree, but I --

3    THE COURT:  Well, that's why you have a judge, if

4  there are disputes, yes.  But --

5    MR. BERMAN:  Yes, I think they would.  And also, just

6  to be clear, today is the first we've heard about any field

7  test and that none of our plaintiffs at the time of their

8  arrest were told there were field tests.  We heard no

9  allegations by a field test.  I sort of heard in passing that

10  that had come up in the context of one of the other cases, but

11  that's sort of this whole new realm of discovery that is news

12  to me right now.

13    THE COURT:  That's helpful.  Thank you.

14    So if I'm correct that an individual claim implicates

15  all of these issues, I return to my first question of:  From

16  your client's point of view, would identifying core discovery

17  and quick settlement discussions be useful to explore or not?

18    MR. BRINCKERHOFF:  If I may just point out one -- if

19  it were only an individual case, I think that that might well

20  be true, although it could be quite complicated perhaps given

21  some of the scientific issues we may have to address here, but

22  because it's a putative class action and it's obvious that just

23  even from what we heard today, that it would appear that the

24  policy is, whenever there's a book or any paper material that

25  appears to have been moist or wet at some point in time,

1    conduct a field test, you have that field test then be the

2    basis for an arrest, that there is a common practice taking

3    place.  Part of any discovery, even if it were just in aid of

4    trying to settle the case, I think would have to include the

5    core issues about liability that I think the Court has been

6    identifying here today, as well as the number of people who

7    have been charged with whatever -- I think the charges may have

8    varied a bit -- but charges that stem entirely from the

9    defendants at DOCS conducting a field test that comes back

10   positive that then results in an arrest and a charge and

11   everything that follows from that.  That's the core of both

12   class, the practice, and the case.  If the question is, what

13   would we need to have meaningful discussions about settling the

14   case on behalf of everybody who's similarly situated based on

15   this policy, we would need to know the liability issues, which

16   we've been talking about, and we would need to know the scope

17   and the number of people who were involved and get basic

18   discovery into the number of hours, days that they were held,

19   things of that sort.

20           THE COURT:  Okay.  So I'm hearing no.  Okay.  Fine.

21   So that's helpful.  Okay.  So we won't plan on identifying core

22   discovery and trying to quickly move into settlement

23   discussions.

24           MR. GOLDMAN:  May I address that.

25           THE COURT:  Yes.

1    MR. GOLDMAN:  So our situations are obviously similar

2 but not exactly analogous.  They have a putative class.  We do

3 not.  And that's obviously not an insignificant distinction.  I

4 think that for us, to identifying the core discovery issues and

5 reaching possibly an early settlement is potentially viable.

6    THE COURT:  Oh, good.

7    So let me ask you, Mr. Zuckerman, how long will it

8 take you to have the kinds of discussions you said you wanted

9 to have to better understand any distinction there may be as

10 relevant to this case, or these cases, between the seizure of

11 contraband and the seizure of material which contains narcotics

12 and understand the laboratory and field test comparison issues

13 we were talking about?  How many weeks is it going to take you?

14    MR. ZUCKERMAN:  I would like three weeks.

15    THE COURT:  Sure.

16    So let's have the schedule here.  I'll take a letter

17 from you on February 21st addressing those issues; then we're

18 going to ask Ms. Rojas, please, to identify -- I'm going to

19 suggest February 28th for a conference.  I'm going to ask

20 counsel then to meet and confer before February 28 to come up

21 with a proposed discovery schedule so that you'll have that

22 information in hand and I think will be in a better position to

23 plan going forward.

24    February 28 at?

25    THE DEPUTY CLERK:  At noon, February 28.

K1v1camc

1          THE COURT:  And please, in those discussions, be as

2     specific as you can with respect to a schedule for initial

3     interrogatories and document demands, number of depositions

4     that you need.  I know that you have live issues with respect

5     to bifurcation and so you may not be in agreement, but I'd like

6     letters.  So the Thursday before, at noon -- that's

7     February 27th at noon -- with your prospective proposal for

8     scheduling this case going forward.

9          Now of course if you have agreement, that's great, but

10    if you don't, put in your own letters.  You don't need to try

11    to negotiate a single letter.  I'll take separate letters from

12    you.  And let's put a limit on those letters of four pages in

13    length; no longer than four pages, individually.

14         We have a motion made January 24th in the 96 case to

15    dismiss the claim seeking injunctive and declaratory judgment

16    relief.

17         MR. ZUCKERMAN:  Your Honor, as well as the *Monell*

18    claims.

19         THE COURT:  Thank you.  So I think what I'd like to do

20    is just stay briefing on that until we have our next

21    conference, and then I'll have a better handle -- I think we

22    all will -- on this case.  And if it makes sense to schedule

23    briefing of that motion at that time, we will.

24         MR. BERMAN:  Your Honor, we were at least seriously

25    contemplating amending our complaint in response to that

1  motion, and I guess I would ask, do we still amend in the 21

2  days as of right or is that time also stayed?

3          THE COURT:  I think that's a very useful issue.  I

4  think you should amend, so we have some stability when we're

5  looking forward.

6          MR. BERMAN:  Okay.

7          THE COURT:  So your date of amendment, was that

8  February 14th?

9          MR. BERMAN:  I think that would be the 21 days, yes.

10         THE COURT:  So that will be an amended pleading in the

11 action 96.

12         MR. BRINCKERHOFF:  Can I just -- in addition to what

13 the Court laid out and requested the defendants to provide in

14 this letter, I think it would be helpful for everyone,

15 especially given what we've heard here today, if the city could

16 identify the field test that they're using apparently in all of

17 these cases so that we can start to get to work on that piece,

18 and perhaps explain it's all about what the policy is.  There's

19 clearly a policy in place of some sort that is at the root of

20 all of this.  If we understand that, I think we can better plan

21 discovery, motions, and everything else.

22         THE COURT:  Well, certainly the identification of the

23 field test, do you have any objection to that, Mr. Zuckerman?

24         MR. ZUCKERMAN:  No.  I mean, that would have had to

25 have been part of the letter that your Honor outlined anyway.

K1v1camc

1          THE COURT:  Good.

2          And I'm going to ask counsel please to meet and confer

3    and talk about informal discovery with each other.  See if you

4    can cut through the heart of this as soon as possible and make

5    good use of our time on the 28th.

6          I want to thank everyone for their presence here.  I

7    look forward to learning more about all of this on the 28th.

8    Thank you, counsel.

9          ALL COUNSEL:  Thank you, your Honor.

10          THE DEPUTY CLERK:  All rise.

11                              o0o

12

13

14

15

16

17

18

19

20

21

22

23

24

25